UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CIVIL NO.  1:03cr87 |
| | ) | |
| JERRY T.  JARRETT | ) | |

OPINION AND ORDER

This matter is before the court on a "Motion for Acquittal Based Upon Renewed Motion to Dismiss Indictment Due to Vindictive Prosecution", filed by the defendant, Jerry T.  Jarrett ("Jarrett"), on December 21, 2004.  The government filed a response to the motion on January 4, 2005, to which Jarrett replied on February 3, 2005.

For the following reasons, Jarrett's motion will be granted.

Introduction

On November 2, 2004, this court denied Jarrett's original Motion to Dismiss Indictment Due to Vindictive Prosecution and Prosecutorial Delay.  Jarrett's case proceeded to trial, and on December 14, 2004, a jury found Jarrett guilty on all counts.  Jarrett has now renewed his motion.  Jarrett contends that the evidence presented at trial further supports his original argument that he was vindictively prosecuted in retaliation for exercising his statutory right, and duty, to provide effective representation to one of his clients, Dr.  Jong Hi Bek.

Even though Jarrett has captioned his motion as a "Motion for Acquittal", it is clear that Jarrett is seeking a reconsideration of this court's November 2, 2004 order denying his motion to dismiss indictment.  Thus, the court will review the motion as a motion to reconsider and not as a motion for acquittal.  See United States v.  Woods, 169 F.3d 1077, 1079 (7th Cir.  1999)(captions for motions do not matter; the court must determine the substance of the motion).  Additionally,

it is clear that the court has plenary power to reconsider any of its interlocutory orders, and may entertain post-trial motions to reconsider in criminal cases.  See United States v. Arango, 879 F.2d 1501, 1504 (7th Cir. 1989)(noting that the district court entertained the defendant's post-trial motion to reconsider its order relating to his motion to dismiss the indictment).  Such a result seems particularly appropriate in a case such as this, where Jarrett did not have an immediate right to appeal this court's earlier order, and evidence was presented at trial that was not available to Jarrett, or the court, before trial.[1]

Standard for Prosecutorial Vindictiveness

Due process prohibits vindictive prosecution.  United States v. Cyprian, 23 F.3d 1189, 1195-96 (7th Cir. 1994).  The relevant inquiry in a claim for vindictive prosecution is (1) whether the prosecutors harbored genuine animus and (2) whether, absent this animus, the defendant would not have been prosecuted.  United States v. Monsoor, 77 F.3d 1031, 1034 (7th Cir. 1996).  In order to prove vindictiveness in the government's decision to seek an indictment, Jarrett must present objective evidence showing genuine prosecutorial vindictiveness.  United States v. Dickerson, 975 F.2d 1245, 1251 (7th Cir. 1992); United States v. Whaley, 830 F.2d 1469, 1479 (7th Cir. 1987).  Jarrett can present this objective evidence by showing that the decision to prosecute was not based on the usual determinative factors.  United States v. Spears, 159 F.3d 1081, 1088 (7th Cir. 1998).  Jarrett claims that the undisputed facts and circumstances of this case objectively show that he has been vindictively prosecuted.

---

[1] For example, Jarrett did not receive Carlos Ripoll's Rule 11 proffer until after he filed a "Motion for Production of Exculpatory Evidence", on December 7, 2004, after his trial had already commenced.

2

Vindictiveness can be established by a showing that the government's prosecution was pursued in retaliation for the exercise of a protected statutory or constitutional right.  Monsoor, 77 F.3d at 1034.  Jarrett contends that the government sought his indictment in retaliation for his exercising his statutory right, and duty, to provide effective representation to his client, Dr.  Bek.  As a licensed attorney who is admitted to practice in the Northern District of Indiana, Jarrett enjoyed the unqualified statutory right to represent persons accused of crimes in the courts of the State of Indiana, including the district courts.  Jarrett claims that his indictment was procured to thwart his continued exercise of that statutory right.

Factual Summary

It is this court's opinion that Jarrett was vindictively prosecuted.  The government in this case had substantial evidence to indict Jarrett in 1999, after he testified before a grand jury which was investigating his financial transactions with two suspected multi-million dollar drug dealers.  The government obtained even more evidence against Jarrett in December of 2000, after receiving a Rule 11 sworn proffer statement from one of the indicted drug dealers, Gregory Goode.  However, it was only after Jarrett began successfully representing a high-profile defendant, Dr.  Bek, that the government became interested in pursuing a criminal case against Jarrett.  In early 2003, Jarrett forced the State of Indiana to dismiss felony-murder charges against Dr.  Bek, leading the federal government to re-indict Bek on federal charges and to seek out the cooperation of Gregory Goode against Jarrett.  Shortly thereafter Jarrett was notified that he was a target of a new federal grand jury investigation, and the government used this fact to seek  Jarrett's removal from the federal Bek case.  The government was unsuccessful in its attempt to have Jarrett removed from the Bek case and it then promptly obtained a six-count

3

indictment against Jarrett, which indictment was procured in contravention of the United States Attorney's Office own internal policies and procedures.  Jarrett subsequently withdrew from the Bek case.

Detailed Factual Background

The factual background, as set forth in this court's order of November 2, 2004, is as follows. On December 8, 1999, Jay Zambrana, Carlos Ripoll and several other co-conspirators were arrested pursuant to a criminal complaint charging these defendants for their involvement with a drug conspiracy.

 On December 15, 1999, Jarrett, who is an attorney, appeared as a witness before a grand jury, pursuant to subpoena.  This subpoena ordered Jarrett to bring with him all of the records he possessed concerning two of his clients, Carlos Ripoll and Gregory Goode.  Jarrett was also ordered to bring the records of his company, Left-Filled, Inc.   Jarrett presented his testimony to the grand jury,  and the government made no further requests for information or testimony from Jarrett.  It is undisputed that Jarrett fully complied as ordered by the subpoena and fully cooperated with the grand jury investigation.

After his arrest, Ripoll cooperated with the government.  Ripoll provided information regarding his drug trafficking activities and his monetary transactions including his transactions with Jarrett.  In fact, during the hearing on the motion to dismiss, held on June 8, 2004, the government acknowledged that in 1999, Ripoll, during his "substantial cooperation", stated that Jarrett knew that the money he was receiving was drug money.  (Tr.  of June 8, 2004 hearing at 15).  The government further indicated that it had "this paper trail of these transactions with Jerry Jarrett and Left Field [sic], Inc."  (Id.). However, the government stated that "at that point,

4

the government was still concerned that now we only had the testimony of one witness confirming that the defendant, Jerry Jarrett, knew where the money was from, unlawful proceeds or unspecified illegal activity, being drug trafficking.  So we continued our investigation."  (Id. at 15-16).  However, the government has also acknowledged that the documents they obtained in 1999 supported the information provided by Ripoll (Gov't Response to Original Motion to Dismiss Indictment, at 10), and that "there was substantial evidence of structuring and money laundering independent of Goode's testimony to support Jarrett's indictment and conviction." (Gov't Response to Renewed Motion to Dismiss Indictment, at 8).  Ripoll also provided information about his drug trafficking activities with Goode.  On November 21, 2000, Goode was indicted on drug trafficking charges and money laundering charges.  Ripoll testified against Goode and on July 13, 2001, Goode was convicted of all charges.

In 2002, the United States Attorney's Office for the Northern District of Indiana and the Lake County prosecutor's office were involved in a joint investigation of Dr.  Jong Hi Bek and others regarding the unlawful dispensing of prescriptions without a legitimate purpose and possible related deaths.  On July 22, 2002, Bek was charged in a federal complaint.   His assistant, Richard Faloona, was charged in a separate complaint on July 22, 2002.  Also on July 22, 2002, the Lake County prosecutor's office charged Bek with state felony murder charges, among other charges.   It is undisputed that the investigative case against Bek involved local, state and federal law enforcement agencies, and thousands of manpower hours.  The arrest of Dr. Bek and his alleged co-conspirators was hailed as a significant law enforcement accomplishment and received extensive media coverage.

On August 7, 2002, Jarrett entered an appearance on Bek's behalf in the federal criminal

action.   On December 9, 2002, the federal criminal complaint against Bek was dismissed on

motion of the government so that the state court action could proceed.  The federal Faloona

criminal case remained pending. Assistant United States Attorney Bernard Van Wormer was

initially assigned to the Faloona matter.  Assistant United States Attorney Susan Collins joined

the United States Attorney's Office in December 2002.  Collins was formerly a Lake County

Deputy Prosecutor.  The government asserts, however, that Deputy Collins was not involved in

the Lake County prosecution of Dr.  Bek.  In early 2003, the Faloona case was reassigned from

Van Wormer to Collins.  Assistant United States Attorney Diane Berkowitz is currently co-

counsel in the Bek and Faloona cases.[2]

 On December 3, 2002, the government filed a federal civil forfeiture case against Bek.

Jarrett entered an appearance on Bek's behalf in the civil forfeiture case on January 8, 2003.

Jarrett remained as counsel until September 2, 2004, when he withdrew for financial reasons.

According to the government, in the beginning of 2003, Goode agreed to cooperate with

the government and assisted in the IRS' investigation of Jarrett.  The IRS then started to prepare

a comprehensive summary report, recommending charges to the United States Attorney's Office

for the Northern District of Indiana.

On or about April 23, 2003, Jarrett was successful in obtaining the dismissal of the state

court felony-murder charges against Bek, due to lack of conclusive toxicology evidence.

However, the remaining state court charges were not dismissed at this time.  Like Bek's arrest,

the dismissal of the murder charges generated extensive publicity, as well as criticism of the

_____

[2]  The Bek case now has six defendants, and on April 22, 2004, a second superseding
indictment was filed adding even more charges.

Lake County prosecutor's office.

On May 31, 2003, Jarrett was notified that he was a target of a grand jury investigation. On August 22, 2003, a superseding indictment was brought in the Faloona case, which indictment added Bek to the federal case.  On August 28, 2003, the remainder of the state court case against Bek was dismissed on motion of the prosecutor, so that the federal indictment could proceed.

On September 4, 2003, the government filed a sealed Notice of Conflict of Interest, seeking to have Jarrett disqualified as Bek's defense counsel in the federal Bek case.  On October 3, 2003, Judge Lozano held a hearing on the Notice of Conflict, and refused to disqualify Jarrett, as Bek wished to keep Jarrett as his counsel.

In October 2003, the IRS issued a report recommending that money laundering and structuring charges be brought against Jarrett, and such an indictment was presented to the grand jury in December 2003.  On December 4, 2003, four years after Jarrett first testified before the grand jury, a new grand jury returned a six-count indictment against Jarrett, alleging money laundering activities involving Ripoll and Goode.

All the while that Jarrett was allegedly under investigation for money laundering, he continued with his successful criminal defense practice in the Northern District of Indiana. Jarrett began representing Stacey Brookshire on July 31, 2001, after Brookshire had entered a guilty plea, but prior to sentencing.  Brookshire had been charged with conspiracy to distribute narcotics, illegally selling narcotics, and using a machine gun in relation to a drug trafficking crime.  On August 2, 2001, Brookshire was sentenced to 165 months imprisonment. On August 6, 2002, Jarrett filed a motion to reduce sentence on behalf of Brookshire.  This motion was

granted on September 23, 2002, and Brookshire's sentence was reduced by 45 months.

On February 4, 2002, Jarrett entered an appearance as defense counsel for Darion Ford, who was charged with possession with intent to distribute cocaine base.  On March 15, 2002, Jarrett filed a motion to suppress evidence on behalf of Ford.  A hearing was held on the motion to suppress on April 12, 2002, before Judge Lozano.  On April 23, 2002, Judge Lozano granted the motion to suppress.  Jarrett then secured Ford's pretrial release on bond on May 21, 2002, and the government filed a notice of interlocutory appeal on May 22, 2002.  On June 26, 2003, the United States Court of Appeals for the Seventh Circuit affirmed the grant of the motion to suppress in the Ford case.  On August 25, 2003, Judge Lozano dismissed the case against Ford, pursuant to the government's motion to dismiss the indictment.

On November 10, 2002, Jarrett entered his appearance as lead defense counsel for Odell Corley, who was charged with a bank robbery in which two persons were killed and another critically injured. On June 3, 2003, after receiving notice that he was the target of a grand jury investigation, Jarrett withdrew from the Corley case.

As noted above, on September 4, 2003, the government filed a sealed Notice of Conflict of Interest in the federal Bek criminal case, informing the court that Bek's counsel, Jarrett, was the target of a federal investigation in the same district and that charges were imminent against Jarrett.        On October 3, 2003, Judge Rudy Lozano[3] held a sealed hearing to determine whether Bek wanted Jarrett to continue representing him.  In an abundance of caution, Judge

---

[3] On May 20, 2004, Judge Lozano recused himself from the Bek case as to all defendants.  The case was reassigned to Judge James Moody.  On August 30, 2004, Judge Moody recused himself from the case as to all defendants.  The case was reassigned to Judge Allen Sharp.

Lozano provided a court appointed attorney, Sheldon Nagelberg, to advise and assist Dr. Bek, if needed, on the limited issue of Jarrett's continued representation. Judge Lozano conducted most of the inquiry of the parties and Dr. Bek stated that he knowingly waived any potential conflict. In fact, Bek consistently expressed that he wanted Jarrett to continue to represent him. Judge Lozano accepted Bek's waiver of any potential conflict of interest.

Jarrett argues that the most telling evidence of the government's vindictiveness can be found in the government's conduct at the October 3, 2003 hearing. Jarrett argues that Assistant United States Attorney Susan Collins relentlessly urged Judge Lozano to disqualify Jarrett from continuing his representation of Dr. Bek, notwithstanding Dr. Bek's unequivocal statement that he waived any potential conflict arising from Jarrett's continued representation. Jarrett contends that Collins' conduct was based upon her desire to interfere with Jarrett's right to zealously and effectively defend his client.

The government denies that Collins (who had been previously employed in the Lake County prosecutor's office) had any desire to interfere with Jarrett's right to defend Bek, and that her role in the October 3, 2003 hearing was minimal and her dialogue with the court was solely to express to the court the government's concerns about the potential ramifications of Jarrett's continued representation of Bek. The government states that Collins did not work on the Bek case while at the Lake County Prosecutor's Office and has not worked on the Jarrett investigation while with the United States' Attorney's Office. The government states that Collins had no input whatsoever into the Jarrett investigation.

With respect to the government's assertion that Collins' role was minimal, the best evidence is the transcript itself. After 26 pages of dialogue, and Bek's consultation with

9

Attorney Nagelberg, the following lengthy dialogue occurred:

THE COURT:          The Court finds that the defendant [Bek] is making a knowing and voluntary decision to keep Mr. Jarrett at this time, and the Court will allow him to do that.

MS. COLLINS:       May we be heard on that, your Honor?

THE COURT:          You may.

MS. COLLINS:       Your Honor, I understand that there was the possibility of Dr. Bek engaging in this waiver, and he certainly has a Sixth Amendment right to – qualified though it may be – to the attorney of his choice, but the Government, obviously, has an interest as well in an error-free, as well as a fair trial, and the Court also has an interest in this, as well. And to that end, the Court does not have to accept Dr. Bek's waiver. This is more having to do about ensuring fairness and integrity in the adversarial process than it is about having the attorney of your choice.

The Court has been talking in terms of possibility. I think that barring something extraordinarily unforeseen, Mr. Jarrett will be indicted in a month's time. And the charges against him are complicated, as well as time consuming, as are, obviously, the case at bar. The discovery in this case involving Dr. Bek is extraordinarily voluminous.

There is going to be press coverage involving, I would assume, Mr. Jarrett's probable indictment. He'll then have to be preparing a defense. And in addition to this conflict of his terms, it's also raising for us a concern in terms of perception, both on the part of Dr. Bek and on the public.

You know, is Mr. Jarrett going to temper his defense, his pretrial decision making, his cross-examination of witnesses to curry favor with the prosecution, as you have indicated before? Is this going to be something that is going to come to Dr. Bek's mind, or for that matter, the public?

Is he going to fear that a spirited defense is going to prompt the Government to pursue the case against his attorney with greater vigor than otherwise might have happened? This is

a concern both of Dr. Bek's potentially, and the public.

Is he concerned that perhaps Mr. Jarrett, because of the position he finds himself in, is he going to become unduly hostile towards the Government and some how tarnish him in front of the jury by this display of hostility?

You know, this is something that he may not be thinking about now, but you can bet that as we go through pretrial procedures, as we go through the trial, and certainly, Monday morning quarterback after the trial, these are going to be reflections that are going to be had on behalf of Dr. Bek, as well as the public, as well.

THE COURT:          Ms. Collins, for the record, I have advised Dr. Bek that in the event that the decisions come unfavorably to him, that he can't complain about this in the future.

Second, Dr. Bek said that he wants to keep him at this time. I have advised him also that if the decision is made on the eve of trial, he may not be allowed to continue the case. He would be allowed at any time to fire and attorney and he is allowed at any time to hire an attorney.

MS. COLLINS:        I understand that.

THE COURT:          Let me finish.

MS. COLLINS:        Sure.

THE COURT:          I have also taken into strong consideration in this case, Ms. Collins, the fact that a defendant has a right to an attorney of his choice if he wants to hire one, with a few exceptions. And you have pointed to some of the exceptions.

In this case, it is my understanding that Mr. Jarrett has been representing this doctor for a period of a year, and there were some state proceedings, and that he has been successful in several of these state proceedings.

I think the Court has to respect the defendant's right to hire an attorney, and the reasons why he wants the attorney.

MS. COLLINS:        Well, I'm just saying that this is the beginning of the

11

inquiry.  And it's true that Mr.  Jarrett has been involved with Dr.  Bek's case for a long time, but the stakes were significantly different then.

I mean, at that time there was in the wind of an investigation.  We are talking about a situation where he is indicted and is a defendant in the same Court that his client is, and that is a significant change of circumstance.  And I respect the fact that he has just waived this conflict, as he is entitled to do.  I'm just saying that the Court does not have to accept that waiver.

And, you know, as – I think its <u>Wheat v.  United States</u>, it puts the Court in a whip saw position, because regardless of what happens, you're going to be appealed on this decision.

Dr.  Bek can sit here and waive his rights until he's blue in the face, but we all know that upon a conviction, this is going to become an appellate issue, and probably an issue for 2255 down the road.

THE COURT:        Ms.  Collins, what I'm willing to do – I have made a ruling on this case – I'm willing to allow you to give me a Memorandum under seal, with copies to counsel, for me to reconsider it with any citations --

MR. BEK [sic]:        Sure, just as long as he understands –

THE COURT:         – with an order also, Mr.  Jarrett, that you give a copy to your client so that the client is aware of what is being said, and in writing so he can have more time to digest it.

*    *    *

THE COURT:        *   *   *  I'm concerned that if I remove Mr.  Jarrett, that's who he chose, and I'm going to be questioned for doing that.  But I'm willing to reconsider, and I'm willing to look at it.

MS.  COLLINS:        I imagine the Court went into this in our absence, and again, we are not trying to invade any attorney-client privilege, our paramount concern, of course, is that he understands all the ramifications.  But if it is financially based, obviously, there are mechanisms.  The government

12

has money tied up.

THE COURT:     I have explained to the doctor that, one, he can petition to the Court, and if he qualifies, I can give him an attorney.  If he has funds of his own, he has to pay for his attorney.  But if his funds are tied up, he can petition to the Court, and I can appoint him an attorney.

If later on it comes out, to find out that he does have assets to pay it, I can make him pay the cost of the attorney that was appointed.

MS.  COLLINS:   And he can make an application to free up some of the funds that we have seized in order to retain counsel.  As long as he understands that he's not behind a financial eight-ball.

THE COURT:     I did not tell him that.  Dr.  Bek, do you also understand that with regards to the funds that you have tied up, if you want to get an attorney, there is a way for you to petition and ask the Court for permission to give you some of those funds back so you can pay for an attorney.  Do you understand that?

MR. BEK:       I didn't know how easy it would be.

THE COURT:     Well, there is a process by which you could petition.  It's up to the Court.

(Transcript of October 3, 2003 hearing before Judge Lozano, at pp. 27-34).

Jarrett argues that Collins' role was more than "minimal", as she continued to question the court's decision, and even brought up the issue of releasing funds that were frozen by the pending prosecution.   Jarrett claims that the above excerpt also supports his contention that Collins was somewhat involved in his investigation, as she expressed knowledge of the details of the case.

The government's long-standing position in this case is that there cannot be any evidence of vindictive prosecution because Jarrett was the target of a federal investigation into money

13

laundering activities well before he began defending Dr. Bek. Jarrett, however, contends that the government has not presented any evidence of Jarrett's target status prior to August 7, 2002 (when Jarrett began representing Bek).

It is undisputed that Jarrett was required to testify before the grand jury on or about December 15, 1999, and that he was questioned about his monetary transactions with Ripoll and Goode, and also about monetary transactions involving Left Filled Inc., and Ripoll. It is also undisputed that after his arrest on December 8, 1999, Ripoll began cooperating with the government. Ripoll provided information regarding his drug trafficking activities and his monetary transactions including his transactions with Jarrett. (Government Exhibit 1, presented at June 8, 2004 hearing). In fact, during the hearing on June 8, 2004, the government acknowledged that in 1999, Ripoll, during his "substantial cooperation", stated that Jarrett knew that the money he was receiving was drug money. (Tr. of June 8, 2004 hearing, at 15). The government further indicated that it had "this paper trail of these transactions with Jerry Jarrett and Left Field [sic], Inc." (Id.). However, the government stated that "at that point, the government was still concerned that now we only had the testimony of one witness confirming that the defendant, Jerry Jarrett, knew where the money was from, unlawful proceeds or unspecified illegal activity, being drug trafficking. So we continued our investigation." (Id. at 15-16). That investigation allegedly continued until October of 2003, nearly 4 years after Ripoll and the financial documents obtained by the government supposedly showed overwhelming evidence that Jarrett had knowingly engaged in money laundering. The government contends that Goode's cooperation in 2003 was the "turning point" in the investigation of Jarrett, as they "now actually had both drug traffickers saying that Jerry Jarrett knew that the money was from

drug dealing." (Id. at 16).  Additionally, the government asserts that Goode's cooperation was important in another respect, in that they were then able to determine that Jarrett was operating his scheme "in a very similar fashion" with respect to both drug traffickers.  (Id. at 17-18).

Renewed Motion to Dismiss

Based on the limited record and arguments before it at the time, this court on November 2, 2004, denied Jarrett's motion to dismiss the indictment, ruling that Jarrett had not presented evidence that he was vindictively prosecuted and that he had not presented evidence contradicting the government's assertion that Goode's decision to cooperate in 2003 provided the additional evidence needed to seek Jarrett's indictment.  The court also noted that Jarrett failed to show that the decision to prosecute was not based on the usual determinative factors, and thus the court had no basis to dismiss the indictment.

In his present motion, Jarrett argues that the evidence presented at trial in this case further supports his claim of vindictive prosecution and provides a sound basis for this court to grant his motion to dismiss the indictment due to vindictive prosecution.  Jarrett recites the following subsequent facts and circumstances which he asserts are relevant to his vindictive prosecution claim.

On December 7th and 9th of 2004, during Jarrett's criminal trial, the government presented the testimony of Gregory Goode, who had been identified as the confidential source in Jarrett's indictment.  Goode admitted that he was serving a 15 ½ year sentence for a money laundering and drug conspiracy conviction entered in July, 2001.  Goode further testified that in January 2003 the government contacted the attorney handling his appeal, Joshua Vincent, and advised him that the government wanted Goode's cooperation against Jarrett.  (Jarrett Trial Transcript,

15

Vol. 3, at 117; see also Affidavit of Joshua G. Vincent, at ¶ 3).[4] Goode also testified that he, his lawyer, and the government entered into an agreement whereby the government would ask the court to reduce his sentence in exchange for his cooperation in the case against Jarrett.

Goode acknowledged that the government filed its written request for reduction of sentence with the court on February 12, 2003. During cross-examination, Goode admitted that he testified before the grand jury that handed down the instant indictment, on March 6, 2003. Goode further testified that he did not advise the grand jury of his 15 ½ year sentence, his downward departure agreement with the government, his previous sworn proffer statement given on December 4, 2000, the prior inconsistent statements contained in his proffer or that the benefits he would receive under the agreement were in exchange solely for his testimony against Jarrett.

Ms. Carrie Poulter, Special Agent with the Internal Revenue Service, testified on December 10, 2004 that she was the case agent on Jarrett's matter. Poulter testified that she was involved in the underlying drug investigation regarding Zambrana, Ripoll and Goode, dating back to December 1999. Poulter testified that in December, 1999, Jarrett provided her with most of the Left-Filled, Inc., corporate, business and banking records which the government presented at trial. Goode had previously testified that Poulter was present when he gave the sworn proffer in December, 2000.

---

[4] This affidavit was submitted to the United States Court of Appeals for the Seventh Circuit in United States v. Gregory Goode, No. 02-1578, as an exhibit to Goode's "Motion to Suspend Briefing and for Limited Remand", filed on March 15, 2005. Paragraph 3 of the Vincent Affidavit states: "In January 2003, the Government contacted defense counsel and proposed to recommend a reduction in defendant's sentence in exchange for defendant's cooperation in another criminal investigation."

Poulter testified that she was present during several interviews with Ripoll between December, 1999 and January, 2000, wherein Ripoll advised her and other government agents that Jarrett was either involved in or engineered the money laundering scheme Ripoll later participated in.  Furthermore, Poulter testified that she was called to testify before the grand jury that issued the indictment of Jarrett in December, 2003.  The evidence presented at trial established that the 2003 grand jury was not composed of the same persons who constituted the 1999 grand jury which heard Jarrett's testimony.  Poulter testified that she did not present Jarrett's 1999 grand jury testimony to the 2003 grand jury.  Neither was Jarrett given an opportunity to testify before the 2003 grand jury, according to Poulter.

Poulter never attempted to speak with Jarrett after December, 1999, to address discrepancies between his testimony and that of Ripoll and Goode.  Poulter never sought explanation from Jarrett about the various cash transactions she viewed as suspicious and indicative of money laundering.

Finally, Poulter admitted that she presented the testimony of Ripoll to the grand jury, in hearsay form, and that the grand jurors were never advised that Ripoll was in the witness protection program, had received financial consideration from the government, had signed a plea agreement with the government and was expecting other benefits from the government.  Poulter testified that the grand jurors were unable to question Ripoll concerning the murders, armed robberies, sexual deviate conduct charge, conspiracy to commit murders and other crimes the government was forgiving him for, in exchange for his cooperation against Jarrett.  Also, Poulter never advised the grand jury that Ripoll's drug trafficking activities were generating between three and five million dollars per year, a notable point considering that Jarrett was suspected of

17

laundering less than $100,000, a paltry sum in the Goode/Ripoll drug business.

Jarrett argues that during his trial, on December 9, 2004, he presented objective evidence that directly contradicted the government's assertion that Goode's decision to cooperate in 2003 provided the additional evidence needed to seek Jarrett's indictment.  Jarrett points out that Goode testified that he had given a sworn proffer statement to the government on December 4, 2000, pursuant to a Rule 11 cooperation letter.  During this proffer, Goode stated that Jarrett was "cleaning his money up", thereby providing evidence that Jarrett was aware that the money had come from some form of illegal activity.  At that time, Goode also told Poulter and other investigators that Jarrett would charge a fee to clean his money.  Jarrett argues that regardless of whether Goode cooperated with the government against Jarrett, this Rule 11 statement would have been corroborative of Ripoll's statements of Jarrett's alleged criminal knowledge.  During the proffer, Goode told the agents that he gave Jarrett $4,000 to clean up for him.  That $4,000 corresponded to one of the deposits made into the Left-Filled, Inc.  bank account in September, 1999.

Jarrett strongly points out that in early 2003, the government actively sought Goode's cooperation against Jarrett.  Jarrett further points out that the joint federal-state prosecution of Dr.  Bek was reaching an important and pivotal state in early 2003, which he claims was the reason the government sought out Goode's cooperation against Bek's counsel, Jarrett.  On December 9, 2002, the United States Attorney had dismissed the federal criminal complaint against Bek, in order for the state charges to proceed unhindered.  However, on November 22, 2002, Jarrett, as Bek's lawyer, obtained a court order forcing the State of Indiana to reveal its expert witness' findings concerning the cause of death of Bek's former patients, whom Bek

18

allegedly killed by illegally distributing controlled substances.  The court order forced the state to release the toxicology reports of Dr.  Bruce Goldberger.  On the same date, the court set a status hearing for January 2, 2003.

On January 2, 2003, the state prosecution failed to produce the expert witness reports and the court set a further status conference for January 31, 2003.  On that date, Jarrett, as Bek's lawyer, orally moved to dismiss the felony-murder charges, due to the prosecutor's failure to produce the reports of the expert witnesses.  The court gave the State of Indiana additional time to present the requested information and affirmed the pretrial conference date of March 7, 2003.

During the interim, the federal prosecutors were arranging their deal with Goode.  The government's Rule 35 motion to reduce Goode's sentence was filed on Goode's behalf on February 12, 2003.  (Trial Transcript, Vol.  3, at 29). On March 6, 2003, the government called Goode to testify before a federal grand jury concerning Jarrett's alleged involvement in Ripoll's money laundering scheme.

On March 7, 2003, the State of Indiana continued to disregard the state court's November 22, 2002 order and moved to continue the jury trial, to which Jarrett, acting on Bek's behalf, objected.  At Jarrett's request, the court ordered the State of Indiana to produce the expert witnesses' report on or before March 21, 2003, or risk having the expert opinions barred at trial.

On March 21, 2003, the state prosecution produced the expert witness report of Dr. Goldberger, whose toxicological findings as to one of Bek's former patients were "consistent with acute heroin intoxication."  Dr.  Goldberger's findings were inconclusive as to the other patient that Bek was accused of killing.  Neither finding was sufficient evidence to convict Dr. Bek of felony-murder.

19

On April 3, 2003, Jarrett moved the state court to sever the two felony-murder counts from the dealing in controlled substances counts and the court granted Jarrett's motion. The felony-murder counts were scheduled to be tried on April 28, 2003. On April 17, 2003, the state of Indiana dismissed the felony-murder counts, citing insufficient evidence, as outlined in Dr. Goldberger's report. On May 30, 2003, almost three months after Goode's grand jury appearance, Jarrett received notification from the government that he was a target of a grand jury investigation into money laundering activities in the Northern District of Indiana. Jarrett contends that the foregoing factual scenario constitutes objective evidence linking Jarrett's target status to the Bek prosecution.

Jarrett further contends that he has presented objective evidence contradicting the government's statement that Goode's cooperation permitted the IRS to complete its reports to the United States Attorney's Office. Jarrett points out that a review of his 1999 grand jury testimony reveals that the government was already aware of his financial dealings with Goode and Blue Ribbon Auto Sales, Inc., as they related to Left-Filled, Inc.

During Jarrett's grand jury testimony, he was shown and asked to identify the cancelled checks issued to Blue Ribbon Auto Sales in September and October of 1999, on behalf of Goode. Jarrett was asked about the dates upon which Goode made his investments. Jarrett was also asked to identify the deposit tickets relative to Goode's investments. Jarrett informed the grand jury that Goode's investments were made in cash. Jarrett further advised the grand jury that Goode had received all of his money back.

During Jarrett's criminal trial, the government did not present any IRS reports or summaries which included information not known to the government in 1999 and well prior to

20

Goode's decision to cooperate.  Nor has the government identified what information it received from Goode that it did not already have, other than Goode's verbal and uncorroborated testimony that he had told Jarrett about his drug dealing activities, prior to making the cash investments.  Jarrett thus argues that the government's bare assertion that Goode's cooperation enabled the IRS to complete its investigation of Jarrett is without factual support.  In fact, as Jarrett points out, all of the summary charts and IRS reports presented during Jarrett's trial were compiled with information received independent of and prior to Goode's cooperation.

Jarrett contends that during his trial, he presented objective evidence that the government's prosecution of him was not based upon the usual determinative factors in the Northern District of Indiana.  Jarrett contends that the best and most objective source of usual determinative factors can be found in the United States Attorneys' Manual ("USAM") issued by the Department of Justice.[5]  Chapter 9 of the USAM sets forth the Department of Justice's policy on grand jury practice.  The USAM states that "in dealing with the grand jury, the prosecutor must always conduct himself or herself as an officer of the court whose function is to ensure that justice is done and that guilt shall not escape nor innocence suffer."  USAM, 9-11.010.  Black's Law Dictionary defines "officer of the court" as a person who is charged with upholding the law and administering the judicial system.  As that term relates to a lawyer, it obliges them to obey court rules and imposes a duty of candor to the court.  Jarrett thus argues that a government prosecutor clearly owes a duty of candor to the grand jury in his or her role as an officer of the court.

_____

[5]  The relevant portions of the USAM were submitted by Jarrett as Exhibit 2.  Also, the entire USAM is public record and available at www.usdoj.gov/usao/eousa/foia_reading_room/usam/.

Jarrett maintains that he presented significant evidence during the trial touching upon the prosecutor's lack of candor with the grand jury. The government failed to advise the grand jury of Goode's 15 ½ year sentence and the Rule 35 agreement he had signed with the government, to give testimony against Jarrett in exchange for a reduction in sentence. Jarrett further notes that the government failed to notify the grand jury that Goode had provided sworn testimony in 2000, which was materially inconsistent with the testimony he was providing to the grand jury. Jarrett states that the grand jury was not aware that Goode had previously testified under oath that he had given Jarrett $4000 (as opposed to $25000) in September 1999. Nor was Goode asked to explain the inconsistencies before the grand jury. Consequently, the grand jury was precluded from questioning him concerning his motive and from fully assessing his credibility.

Chapter 9-11.110 of the USAM further provides that a prosecutor must be scrupulously fair to all witnesses and must do nothing to improperly influence the grand jurors. Jarrett argues that the withholding of extremely material information, the background and motive of the witness, Goode, created a substantial likelihood that the grand jury would be improperly influenced to indict Jarrett on less than all of the relevant and material facts. Jarrett further claims that the grand jury was improperly influenced with respect to Ripoll's testimony, as the grand jury was not advised of his deal with the government, his past criminal history and the extent to which he owed the government his testimony.

Chapter 9-11.101 states that the grand jury's principal function is to determine whether there is probable cause to believe that one or more persons committed a certain federal offense within the venue of the district court. Probable cause is defined as "a reasonable ground to suspect that a person has committed or is committing a crime." "Reasonable" is defined as what

is fair, proper and moderate under the circumstances.  It is something that is established according to reason.  Black's Law Dictionary, 8th Ed.   Jarrett contends that the government subverts the grand jury's probable cause determination when it fails to present a proper and fair balance of the material information to the grand jury.  Jarrett argues that in the present case, the government not only omitted material information, it permitted testimony which was perjurious, and presented that testimony to the grand jury.  Jarrett points out that when Goode testified that he had not dealt in crack cocaine, the government knew that he was committing perjury.  Jarrett claims that the government has amassed overwhelming evidence that Goode dealt in crack cocaine, yet it did nothing to correct the record or advise the jury of this perjurious statement.

Chapter 9-11.150 of the USAM provides that a grand jury may properly subpoena a subject or a target of the investigation and question the target about his involvement in the crime under investigation.  Jarrett argues that it would certainly seem reasonable, in light of all the other circumstances of Jarrett's case, that the grand jury be permitted to hear from Jarrett, if he so chose to speak, prior to being requested to indict.  Jarrett points out that his testimony concerning the indictment was readily available to the grand jury, in the form of his 1999 grand jury testimony.  Yet there is no evidence that the 2002 grand jury was ever advised that Jarrett had testified before the 1999 grand jury concerning his relationship with Ripoll and Goode.

Jarrett further points out that Poulter testified that she did not present Jarrett's testimony to the grand jury in 2003.  Jarrett claims that his grand jury testimony was substantial exculpatory evidence on the important issue of Jarrett's knowledge of the source of the monies which Ripoll and Goode had invested into his business.  Chapter 9-11.233 of the USAM provides that the policy of the Department of Justice requires a prosecutor to present or

23

otherwise disclose substantial evidence that negates the guilt of the subject of the investigation, to the grand jury before seeking an indictment against such a person.

The government does not deny failing to follow the procedures set forth in the USAM. Rather, the government argues that it is well-established that there is no duty to present exculpatory evidence to the grand jury.  United States v.  Williams, 504 U.S. 36 (1992); United States v.  Stout, 965 F.2d 340, 343 (7th Cir.  1992).  While the cited cases make it clear that a court may not dismiss an otherwise valid indictment on the ground that the government failed to disclose exculpatory evidence to the grand jury, that is not the point.  Jarrett's point is that the government failed to follow their own policies and procedures when seeking the indictment against Jarrett.  As Jarrett argues, this failure is evidence which Jarrett may use to support his claim of vindictive prosecution and meet his burden of showing that the government's decision to prosecute was not based on the usual determinative factors.  United States v.  Spears, supra.

Jarrett also notes that Chapter 9-2.032 of the USAM sets forth a procedure to be followed whenever the prosecutor seeks to indict an attorney on charges, based in whole or in part, on actions or omissions by the attorney during the representation of a current or former client, when the client is likely to be a witness against the attorney.[6]  The USAM policy requires prior

---

[6]  United States Attorney Manual, 9-2.032, Notification to the Criminal Division of Certain Prosecutions of Attorneys provides in pertinent part:

> ... the United States Attorney ... shall notify the Assistant Attorney General, Criminal Division, whenever his/her office intends to file ... indictment against an attorney ...

> When -- (I) the charges are based, in whole or in part, on actions or omissions by the attorney during the representation of a current or former client; and

notification to the Assistant Attorney General, Criminal Division whenever such an indictment is

sought.  Jarrett points out that there is no evidence from the government indicating compliance

with this policy.

The government concedes that it did not notify the Assistant Attorney General of the

Criminal Division.  The government claims that Jarrett was disbarred during the time that he

conducted the transactions with Ripoll, and thus the notification provision did not apply.  The

government further argues that the charges involving Ripoll and Goode had nothing to do with

the attorney-client relationship.  According to the government, Ripoll and Goode went to

Jarrett's law office, Robert Lewis & Associates, for legal services prior to the illegal money

laundering activity.  The government claims that Jarrett provided paralegal or legal assistant

services for Ripoll and Goode, and then approached Ripoll and Goode about laundering their

drug money through his corporation, Left-Filled, Inc.

Jarrett, in reply, disputes that he was disbarred during the time that he conducted

transactions with Carlos Ripoll, and claims that his disbarment order was set aside on January

23, 1998.[7]  Moreover, Jarrett points out that the evidence introduced at trial established that

_____

> (ii) the attorney's current or former client is, or is likely to be, a
> witness against the attorney; and
>
> (iii) the client will, or is likely to, testify against the attorney
> pursuant to a non-prosecution, cooperation, or similar agreement
> with the government.

[7] Jarrett cites to the docket sheet of Case No.  45 S 00-9308-DI-00873, In re: Jerry T. Jarrett, submitted as Exhibit 3.  The docket entry for January 23, 1998 states: "Issued the enclosed Order: It is, therefore, ordered that the statement of circumstances and conditional agreement for discipline tendered by the parties in this case is approved."    However, there is no indication what the terms were of the "conditional agreement for discipline".  This same docket sheet has an entry for September 17, 1999, which states: "Issued the enclosed Order: It is,

several of the transactions between Goode and Jarrett occurred after September 16, 1999, the date the government claims Jarrett was reinstated to the practice of law.  Jarrett maintains that at that time, separate attorney-client relationships existed between Goode and Jarrett and Ripoll and Jarrett.

Jarrett further argues that the notification provision is not triggered by the decision to investigate, but by the decision to indict.  When the government decided to seek indictment of Jarrett in 2003, Jarrett clearly was a licensed attorney and the charges against him were based, in part, on his actions during the representation of former clients, Ripoll and Goode.  Jarrett points out that the notification provision does not require the actions of the attorney be related to the representation, but must occur during the representation.  Thus Jarrett concludes that the government failed to follow the usual procedure in seeking the indictment against him.

Finally, Jarrett takes issue with the government's claim that Goode's cooperation was significant to its decision to seek an indictment against Jarrett.   Jarrett points out that Goode is a highly practiced prevaricator, and that the government was fully aware of this trait before seeking Jarrett's indictment. During the trial, Goode admitted to telling a lie while under oath, concerning the $4000 he claimed he gave Jarrett in 1999.  Goode testified that he lied about giving Jarrett a total of $20,000 to clean up for him.  Goode further testified that he lied about how he received the money back from Jarrett.  Goode also testified that the amount of money he told the agents he received back from Jarrett was not correct.  (Trial Transcript, Vol.  3, at 54-56).

---

therefore, ordered that the Petitioner, Jerry T.  Jarrett, is hereby reinstated as an attorney admitted to practice law in this state, effective immediately."  Thus, it appears that Jarrett was reinstated on September 17, 1999 and not on January 23, 1998 as he claims.

Goode admitted that he repeatedly lied during his proffer statement, even though he understood the purpose of his statement was to convince the government he was cooperative by his truthfulness, so that the government would not object to his pretrial release from custody. (Trial Transcript, December 7, 2004 Proceedings, at 46).  Goode testified at trial that he did not tell the truth because Attorney Darnail Lyles told Goode that if he admitted to dealings with Jarrett, Goode would be exposed to more charges.  (Id. at 43).  Later, Goode testified that he lied during the proffer because he was afraid of how the government would use the information against him when he stopped cooperating. (Id. at 48).

Jarrett argues that the government did not object to Goode's release, even though it knew he was not truthful during the proffer.  Jarrett claims that this is further evidence of Goode's knowledge that the government would not take action against his repeated perjury.  Jarrett points out that Goode admitted during Jarrett's trial that he understood on December 4, 2000 that he would not be prosecuted for anything he disclosed to the agents, except if he lied or made false statements.  (Trial Transcript, Vol. 3, at 35-36).  Yet, Goode maintained a steady course of deception.  Goode testified that he lied to agents when he told them he had no involvement in drugs.  Goode also admitted to lying to the grand jury concerning Jarrett's alleged knowledge of Ripoll's drug dealing activities.  (Id. at 48-50).

Jarrett points out that Goode had a very strong motive to fabricate his testimony that Jarrett was aware of his drug dealing activities, in order to have his 15 ½ year sentence reduced. Jarrett also reiterates that Goode has a history of lying under oath when he believes it is in his favor to do so, and that the government was fully aware of this fact.

This court finds that Jarrett's case presents clear-cut indicia of vindictive prosecution.  It

is clear that Jarrett is an aggressive and highly successful defense attorney.  The record shows that Jarrett repeatedly found holes in the government's cases, both state and federal, and was able to get charges dismissed against his clients, and was able to secure reductions in their sentences.

It is also absolutely clear that the government had all the evidence it needed to indict Jarrett in 1999.  The government had Jarrett's bank records, his company records, Ripoll's damning testimony that Jarrett knew he was laundering drug money, and Goode's Rule 11 proffer statement which also stated that Jarrett knew he was laundering drug money.  In fact, if the court had been aware of the existence and contents of Goode's Rule 11 proffer, and the nature of Goode's proposed (and blatantly unreliable) testimony, this court would have granted Jarrett's original motion to dismiss indictment for vindictive prosecution.

This court finds that the government's purported "turning point" evidence, Goode's agreement to fully cooperate in the "investigation" against Jarrett, to be a complete sham.  There is no evidence that there was any further investigation of Jarrett from 1999, when Jarrett testified before the grand jury, and early 2003, when Jarrett, while representing Bek, was able to obtain a state court order forcing the state prosecution to reveal its expert witness findings concerning the cause of death of Bek's former patients.  It was at this time, when the state prosecution against Bek was quickly unraveling, and the federal prosecutors were scrambling to get Bek re-indicted and added to the Faloona case, that the federal prosecutors sought out Goode's cooperation.

The government held Goode out as a star witness, the one witness who could make its case against Jarrett complete, the witness who would credibly corroborate Ripoll's testimony that Jarrett knew he was helping drug dealers launder dirty money.  In actuality, it is clear that

28

Goode was merely an excuse to re-open the investigation against Jarrett, solely in an attempt to force Jarrett out of the Bek case.   Goode ranks as one of the worst witnesses to ever take the stand on the government's behalf.  Jarrett, during his cross-examination of Goode, fully displayed that Goode is an absolute liar, and will say whatever most benefits him at the moment. Goode admitted that he lied under oath, because he was afraid of the consequences of telling the truth.  Likewise, when the consequences are favorable to him, like they were in the Jarrett trial, it was clear that he would lie again, and tell whatever story the government wanted to hear, in exchange for a reduction in his lengthy prison sentence.

The government's vindictiveness and true motive in seeking Jarrett's indictment is further shown by the government's act of filing a Notice of Conflict of Interest in the Bek case. Jarrett was defense counsel in several other cases during this time, and the government did not file a Notice of Conflict of Interest in those cases, even though one of them was a highly-publicized federal death penalty case.  Moreover, during the hearing on the Notice of Conflict, the federal prosecutor, Susan Collins, literally begged Judge Lozano to take Jarrett out of the Bek case against Bek's wishes.  Collins had been previously employed in the Lake County prosecutor's office, which office had suffered an embarrassing and highly-publicized setback in the Bek state prosecution, due to Jarrett's lawyering skills.

Further evidence of the government's vindictive nature is the fact that it didn't follow its own internal procedural rules, as set forth in the United States Attorney's Manual, in seeking Jarrett's indictment.  See United States v. Spears, 159 F.3d 1081, 1088 (7th Cir. 1998)(evidence that the decision to prosecute was not based on the usual determinative factors is "objective evidence" supporting a claim of vindictiveness).  The government presented a totally one-sided

29

presentation to the grand jury that indicted Jarrett, using a witness that had a history of lying before a grand jury, and who actually lied to the Jarrett grand jury without any interruption or repercussion from the government. There was, as Jarrett argues, toleration and acceptance of perjury by the federal government. While the government is correct that it is not legally required to present any exculpatory evidence on behalf of grand jury targets, the fact remains that it did not follow its own internal rules and that the federal prosecutors did not conduct themselves "as an officer of the court whose function is to ensure that justice is done and that guilt shall not escape nor innocence suffer." USAM, 9-11.010. Rather, the federal prosecutors had one goal in mind, to remove Jarrett from the federal Bek case at all costs.

The government makes much of the fact that it won at trial. Jarrett was convicted on all counts, and thus, they argue, they must have done everything right. The government points out that the jury apparently believed Goode, or at least didn't find his testimony damaging enough to negate the rest of the government's evidence. However, Jarrett's conviction is not relevant for purposes of determining whether he was vindictively prosecuted. The issue of vindictive prosecution was not (and could not) be put before the jury, thus the jury verdict has no bearing on the issue presently before the court. The only issue here is whether Jarrett was prosecuted solely for the vindictive purpose of preventing him from continuing to represent his client, Dr. Bek. The government claims that it had enough evidence to indict Jarrett, but again, that is not the point. While the government has great latitude in deciding when to bring a federal case, it may not indict simply to remove a foe from a highly-publicized case in which the prosecutors have suffered criticism, even if it has overwhelming evidence that a crime has been committed. Similar to the inquiry when ruling on a motion to suppress, the inquiry in this case is

independent of the weight of the evidence against Jarrett, and the only issue is whether proper procedure, law and ethics were followed.  Just as a favorable ruling in a motion to suppress permits a defendant to walk free even when insurmountable evidence is against him, a finding of vindictive prosecution may be found irrespective of the evidence supporting the prosecution, when the defendant has shown that the prosecution harbored genuine animus which was the sole factor leading to the defendant's indictment.  United States v. Monsoor, 77 F.3d 1031, 1034 (7th Cir. 1996).

This court is mindful of the fact that there are no reported appellate decisions in which a finding of vindictive prosecution has been upheld.  Further there is an extreme paucity of cases in which vindictive prosecution has been found by the district court, with United States v. Wilson, 120 F. Supp. 2d 550 (E.D. N.C. 2000), apparently being the only reported decision in which an indictment was dismissed due to vindictive prosecution.  Wilson was reversed by the Fourth Circuit Court of Appeals, at 262 F.3d 305 (4th Cir. 2001).

As expected, most of the claims of vindictive prosecution are "throw away" arguments presented by defendants who simply believe (or want the court to believe) that they were prosecuted because the government didn't like them or didn't like something they did.  In these cases, there is no evidence of vindictive prosecution, but mere conclusory allegations that the prosecutors must have harbored animus against the defendant.

In contrast, there are cases like Wilson.  The facts in Wilson were significantly less compelling than the facts in the present case; however the case does provide helpful guidance. In Wilson, the defendant appealed his conviction for possessing a firearm immediately after sentencing.  The conviction and sentencing occurred in the District of South Carolina. The

31

defendant was transferred from federal custody to state custody, to face unrelated state charges. At the conclusion of the state court proceedings, the defendant was erroneously released instead of being returned to federal custody.  The defendant's federal conviction was overturned by the Fourth Circuit Court of Appeals.   Less than a month after his successful appeal, the defendant was served with a detainer charging him with escape.  A few weeks later, the defendant was indicted for escape in the Eastern District of North Carolina.  The defendant claimed vindictive prosecution.  The district court found vindictive prosecution, basing its decision on several factors.  First, the district court noted that the day after defendant's successful appeal, a memorandum written by a Deputy Marshal and dated January 25, 2000, accusing the defendant of being violent and threatening the federal judge at his original sentencing was faxed to the Office of the U.S. Attorney for the Eastern District of North Carolina.  When the U.S. Attorney for the Eastern District of North Carolina declined to prosecute, the U S.  Attorney in South Carolina personally requested the U.S. Attorney in the Eastern District of North Carolina to prosecute the defendant.  The district court held that the defendant had shown that the U.S. Attorney for the Eastern District of North Carolina prosecuted the defendant on the request of the U.S. Attorney for the District of South Carolina solely in furtherance of personal animus against the defendant based on his successful appeal of the unrelated conviction obtained by the South Carolina U.S. Attorney.

The Fourth Circuit, in reversing the district court, noted that even though the defendant in Wilson was unable to demonstrate actual vindictiveness, he could still succeed on his claim of vindictive prosecution by demonstrating that the circumstances of the case support a presumption of vindictiveness and thereby shift to the government the burden of justifying its

32

conduct.  262 F.3d at 305.  The Court held that:

> To invoke this presumption, Wilson must point to circumstances surrounding the initiation of the prosecution and show that they "pose a realistic likelihood of 'vindictiveness'" Blackledge, 417 U.S. at 27, 94 S.Ct.  2098.  When the circumstances pose such a likelihood, a presumption may be warranted even if the defendant has no direct evidence of an actual retaliatory motive.  See United States v.  Williams, 47 F.3d 658, 660 (4th Cir.  1995).  But the circumstances in this case must be sufficiently suggestive of vindictive prosecution that when similar circumstances are presented in other factual contexts, the same conclusion would be suggested.  See Goodwin, 457 U.S. at 381, 102 S.Ct.  2485.

Id.

The Wilson court then held that the circumstances in that case did not give rise to a presumption that the escape charge was prosecuted in North Carolina solely to punish Wilson for successfully appealing an unrelated conviction obtained by prosecutors in South Carolina.  Id. at 320.

It is an understatement to say that the circumstances in the case at bar are far more compelling than the circumstances in Wilson.  In the present case there is an long series of events over a greater time period, each of which evidence vindictive prosecution.  Additionally, all the circumstances arose in the same county, Lake County, Indiana.  Even more importantly, the circumstances in this case, if ever possibly replicated in another case, would suggest the same conclusion that vindictive prosecution had occurred.   Thus, even though the Wilson court did not find vindictive prosecution, their opinion supports this court's conclusion that not only is there a presumption of vindictive prosecution in the present case, this presumption was totally unrebutted by the government.

The cases in the Seventh Circuit in which the issue of vindictive prosecution has been

raised pale in comparison to the present case.  For example, in <u>United States v.  Spears</u>, 159 F.3d

1081 (7th Cir.  1999), the defendant claimed that the government sought his indictment for arms

possession in retaliation for exercising his right to a fair trial in a state murder charge, and his

subsequent acquittal thereof.  The defendant in <u>Spears</u> was unable to demonstrate how the

federal prosecutor had any actual vindictiveness toward him, but claimed that the animus of the

state prosecutor should be imputed to the federal prosecutor.  The Seventh Circuit upheld the

district court's finding that even if the state prosecutor did claim that she wanted to "get" the

defendant at all costs and that he would have no defense to a firearms charge in federal court, the

behavior does not rise to the level of actual vindictiveness.  159 F.3d at 1086-87.  As the district

court noted, the state prosecutor was merely reciting policy reasons for the federal prosecution,

and her comments about the lack of a defense were nothing more than her personal belief in the

dynamics of the criminal justice system.  <u>Id</u>.  The Seventh Circuit held that the district court had

not erroneously found that although the state prosecutor had an interest in the defendant's

prosecution, that was not enough to constitute a vindictive animus for prosecuting the defendant

for exercising his legal right to a fair trial in the state's murder case against him.  <u>Id</u>.  The

Seventh Circuit concluded that:

> In the end, it was the federal prosecutor's decision to bring the
> indictment against Spears.  Spears did not present any evidence
> that the federal prosecutor did not make the ultimate decision to
> bring the indictment, nor did Spears present any objective evidence
> of actual animus on the part of the federal prosecutor; we find that
> the district court acted within its discretion and affirm his
> conviction.

<u>Id</u>.  at 1087-88.

In the present case, we have overwhelming evidence of actual animus on the part of the

34

federal prosecutor, which evidence is far more compelling than a simple "interest in the

defendant's prosecution".  Jarrett has shown that the government knew it could have indicted

him in 1999, had all of its evidence by the end of 2000, yet did not target Jarrett until he forced

the Bek case to federal court, where he stood as a formidable opponent.  The government then

sought out Gregory Goode, a known liar, to testify against Jarrett, and filed a motion in the Bek

case to have Jarrett removed as counsel against Bek's will.  Meeting with no success, the

government then indicted Jarrett, using a grand jury that was unaware of Jarrett's previous grand

jury testimony, and which received untruthful testimony from Goode.

In United States v.  Dickerson, 975 F.2d 1245, 1251 (7th Cir.  1992), the Seventh Circuit

noted that a prosecution is vindictive if it is undertaken in retaliation for the exercise of a legally

protected statutory or constitutional right, and then held that:

> There is no such evidence in this case.  There is no evidence that
> the federal charges were brought because the prosecutor wanted to
> engage in self-vindication or to persuade Dickerson to plead guilty.
> Dickerson asserts (without any proof) that federal agents and
> police were angered by his successful challenge to the legality of
> the search; since FBI agents and Indiana police officers are not and
> have no control over federal prosecutors, however, this
> speculation, even if proven, would not show prosecutorial animus.
> The sole basis of Dickerson's vindictive prosecution claim, then, is
> the timing of the federal prosecution.  FBI Agent Rice began to
> explore the possibility of filing federal charges only after he
> discovered that the state court had granted Dickerson's motion to
> suppress.  Bringing the federal indictment shortly after the state
> court suppressed the evidence seized from his home, Dickerson
> argues, creates an inference that the federal prosecution was
> motivated by a desire to punish him.
>
> If new federal charges were brought against Dickerson after a
> federal court granted his motion to suppress in a pending federal
> prosecution, the timing of the new federal charges might raise an
> inference of actual vindictiveness.  But courts have recognized that
> the same is not true where, as in this case, the second prosecution

35

is brought by a different sovereign.

> Since armed bank robbery violates both Indiana and federal law, Dickerson could have been prosecuted by Indiana or the United States, by both sovereigns or neither.  The decision to prosecute is within the discretion of each sovereign.  And "[t]here is no vindictiveness as long as the prosecutor's decision is based upon the normal factors ordinarily considered in determining what course to pursue.  There is no indication in the record that the federal prosecution of Dickerson was motivated by anything other than the government's determination that Dickerson was more likely to be convicted in federal court -- a factor ordinarily and legitimately considered in deciding whether or not to prosecute. The timing of the federal prosecution, alone, cannot change this legitimate exercise of normal prosecutorial discretion into a vindictive prosecution.

Id. at 1251-52.  (citations omitted).

Again, the facts in Dickerson  are not even slightly comparable to the facts in the present case.  Jarrett has presented a very significant amount of evidence that the prosecutor's decision in his case was not based on the "normal factors ordinarily considered".  In fact, Jarrett has shown that the prosecutor did not even follow internal policies and guidelines in seeking his indictment and at least arguably tainted the grand jury that returned his indictment. Moreover, Jarrett has  shown a steady pattern of events leading up to his indictment that shows that the government was seeking his indictment to force him out of the Bek case.

A thorough search of all federal cases has not uncovered even one case remotely similar to the present case.  Thus, while this court has some guidance as to what is not vindictive prosecution, it has not been provided with any clear precedent as to what is vindictive prosecution.  Nevertheless, this court is of the firm conviction that Jarrett has come as close as any defendant ever will in proving vindictive prosecution.  It is hard to imagine what more a defendant could do, short of obtaining a verbal confession from a federal prosecutor, to show

36

vindictive prosecution.  Jarrett has shown that there was cause for animus, due to his successful representation of Bek who was now in federal court.  Jarrett has shown significant acts that arguably were taken in furtherance of that animus, such as seeking out Goode's cooperation and seeking to have Jarrett removed from the Bek case against Bek's will.  Jarrett has shown that he was involved in other federal cases, including a death penalty case, in which his removal was not sought, even though the government claimed to be protecting the integrity of the criminal justice system by seeking to remove Jarrett from the Bek case.  Jarrett has shown that the government's star witness, Gregory Goode, is an absolute liar and, moreover, that he had already cooperated with the government and provided a Rule 11 statement implicating Jarrett, meaning that the government's stated reason for seeking his indictment in 2003 instead of years earlier was patently false.  Finally, Jarrett has shown that the government did not follow its internal policies and procedures when seeking his indictment.

While any one of these facts might appear suspicious but not indicative of vindictive prosecution, the cumulative weight of all these facts is too much for this court to let pass under the screen of prosecutorial discretion.  Consequently, the court must grant Jarrett's motion to dismiss the indictment.

<u>Conclusion</u>

Based on the foregoing, Jarrett's Motion to Dismiss Indictment Due to Vindictive Prosecution is hereby GRANTED.  The jury verdict in this case is hereby VACATED.  The Clerk of the Court is directed to show Counts 1-6 of the Indictment as dismissed.

Entered: May 23, 2005.

<u>s/ William C.  Lee</u>
William C. Lee, Judge
United States District Court

38