UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>JERRY JARRETT )<br>)<br>    Defendant. ) | CASE NO. 1:03-CR-087 |

## OPINION AND ORDER

Before the Court is Defendant Jerry Jarrett's ("Jarrett's") "Renewed Motion to Dismiss Indictment or, in the Alternative for a New Trial Based Upon Prosecutorial Vindictiveness and Newly Discovered Evidence" [DE 182] filed on September 24, 2010. On the same date, Jarrett also filed a "Request for Revised Presentence Investigation Report." [DE 183]. The Government responded on October 29, 2010 to the former motion and on November 1, 2010 to the latter. After the time for filing reply briefs closed as to both motions, the Court was notified that no replies to either motion would be filed.

For the following reasons, Jarrett's Renewed Motion to Dismiss Indictment will be DENIED. His request for a revised presentence investigation report will be GRANTED.

## PROCEDURAL BACKGROUND

On December 14, 2004, a jury convicted Jarrett on three counts of money laundering, and particularly of knowingly laundering proceeds from drug transactions, in violation of 18 U.S.C. §1956(a)(1)(B)(i), one count of money laundering in violation of 18 U.S.C. §1957, and two counts of structuring in violation of 31 U.S.C. §5322(b). Thereafter, Jarrett filed a Renewed Motion for Judgment of Acquittal seeking to have his indictment dismissed based on a theory of vindictive

1

prosecution.[1] The undersigned granted that motion (Docket #79, 5/23/2005), vacated the jury verdict, and the Government appealed. On appeal, the Seventh Circuit Court of Appeals reversed and remanded after concluding that Jarrett did not have "clear and objective" evidence of vindictive prosecution; rather, he presented only suspicious circumstances and inferences. The Seventh Circuit further ordered the jury verdict reinstated. *United States v. Jarrett,* 447 F.3d 520 (7th Cir. 2006). At the conclusion of its Opinion, issued on June 2, 2006, the Seventh Circuit indicated that Jarrett "will have a full opportunity to challenge any aspect of his trial, or proceedings that occur after remand, by *appropriate* motion or appeal."

This set in motion a flurry of legal motions on remand including: several Motions to Continue Sentencing [DE 108, 114, 116]; Jarrett's Motion to Appoint Counsel [DE 109], Jarrett's Motion for Acquittal of Judgment [DE 121]; and Jarrett's Motion to Produce Documents [DE 122]. The court denied the Motion for Acquittal of Judgment [DE 128], but granted the Motion to Produce Documents [127], which sought internal government documents in an attempt to meet the rigorous standard for vindictive prosecution the Seventh Circuit indicated was required in its Opinion. Believing that the issue was foreclosed by the Seventh Circuit's opinion and generally unhappy with the ruling on the Motion to Produce Documents, the Government filed an appeal seeking a Writ of Mandamus [DE 133] ordering the undersigned to proceed to sentencing in this cause. That appeal was denied on June 13, 2008 [DE 138]. Thereafter, the Court ordered the Government to produce the documents previously ordered for *in camera* review. [DE 144]. Those documents were provided to the Court for review on April 4, 2009.

---

[1]This was Jarrett's second motion to dismiss the indictment due to vindictive prosecution, the first having been made pre-trial and denied by the undersigned. See Docket # 30 (11/02/04).

On June 15, 2009, after completing its *in camera* review, the undersigned ordered the Government to produce particular documents outlined in the Order [DE157]. The Government then filed an objection to that Order contending that certain of those documents were privileged. On April 20, 2010, the Court denied the Government's assertion of privilege as to all documents and ordered them produced. The Government complied on April 30, 2010. After reviewing the documents, Jarrett filed the present motions seeking dismissal of the Indictment or a new trial based upon information in the documents produced by the Government that he contends establish vindictive prosecution.

## **FACTUAL BACKGROUND**

The underlying facts of this case are well-established and have been fully articulated in the Seventh Circuit's opinion in *United States v. Jarrett*, 447 F.3d 520, 522-524 (7th Cir. 2006).[2] They are recounted herein from the Seventh Circuit's Opinion for completeness.

> Jarrett, it is alleged, began cleaning up dirty money in April 1999, when a drug dealer named Carlos Ripoll brought him $67,000 in cash. Jarrett deposited the money in a series of small transactions (to evade currency transaction reports) into the bank account of a dormant small business he controlled.[3] Jarrett then prepared a backdated stock purchase agreement, representing that Ripoll had "invested" $15,000 in Jarrett's company, and issued a series of checks to Ripoll totaling $54,452 for "return on investment." As compensation for his services, Jarrett pocketed $12,000.

---

[2] In the present motion, neither Jarrett nor the Government dispute the underlying sequence of events or facts established at trial. Presumably, Jarrett intends to challenge his underlying conviction on the merits once he is sentenced and it is appropriate to appeal his conviction.

[3] Jarrett incorporated this business, "Left-Filled, Inc.," with his son in 1997, a time when Jarrett was disbarred for what the Indiana Supreme Court called "an alarming pattern of dereliction of duty, abandonment of clients' interests, often resulting in irreparable damage, and a blatant disregard of professional responsibilities." *In re Jarrett,* 657 N.E.2d 106, 109 (Ind.1995). Left-Filled was supposed to market products for left-handed people. However, it apparently sold only a few items and never turned a profit. Jarrett regained his license to practice law in September of 1999.

Beginning in September 1999, Jarrett executed a similar series of sham transactions with a cocaine dealer named Gregory Goode, laundering $25,000 in drug money and keeping a $7,000 profit.

Three months later, Ripoll was arrested and quickly began talking to the government. Among other things, he described his financial dealings with Jarrett, telling investigators that Jarrett was aware that he was handling drug money. Ripoll also described his drug dealings with Goode.

A federal grand jury subpoenaed Jarrett to testify in December 1999. Jarrett was designated as a fact witness, not a target, and fully cooperated. He produced records of his financial dealings with Ripoll and Goode but denied any knowledge that the money he received had come from drugs. (He said Ripoll and Goode told him that the money came from gambling winnings, selling cars, and rehabbing houses.)

In late 2000, after Goode was arrested, he gave a sworn proffer to the government in anticipation of plea negotiations. Goode, who at the time was represented by an attorney Jarrett told him to hire, said Jarrett cleaned up a small amount of his money. However, he was equivocal about whether Jarrett knew the money came from drug dealing. In the proffer, Goode lied about his own drug-dealing activities and, according to a statement given a few years later, about the amount of money he gave Jarrett. The plea negotiations fell apart, and nothing came of the proffer. After he was tried and convicted of conspiracy to distribute cocaine and money laundering, Goode fired the lawyer who was recommended by Jarrett.

Although it apparently had enough evidence to indict him, the government let its investigation of Jarrett lay dormant throughout 2001 and 2002. Prosecutors said they were unwilling to go to trial with only the testimony of one convicted criminal-Ripoll-to establish Jarrett's knowledge that the cash he deposited came from drug proceeds.

In January 2003, the U.S. Attorney's office for the Northern District of Indiana again approached Goode, this time through the new attorney who was representing him on appeal. The attorney had been appointed by the court and thus, unlike Goode's trial counsel, had no ties to Jarrett. This time the two sides struck a deal, and 2 months later Goode changed his story from his 2000 proffer and told a grand jury that Jarrett did indeed know that the money they exchanged came from selling drugs. The grand jury knew Goode was a convicted felon (he testified in his prison jumpsuit) and thus could weigh the consideration that his testimony might not be completely credible. However, the government did not tell the grand jury that Goode was testifying as part of a deal that would reduce his 15-1/2-year sentence. Ripoll's earlier statements about Jarrett were presented in hearsay form. With Goode's testimony in hand, the government notified Jarrett in May 2003 that he was the target of a grand jury investigation for money laundering.

Meanwhile, Jarrett was busy with the headline-grabbing case of Dr. Jong Hi Bek. In July 2002, authorities capped a long-running, joint federal-state investigation by raiding the Gary clinic where Bek was prescribing painkillers and other controlled substances to drug addicts. Lake County (Indiana) prosecutors charged Bek with felony murder for the deaths of two of his clients. Federal prosecutors also charged him with illegally distributing controlled substances; they later dismissed this complaint so the state case could proceed, but about the same time filed a federal civil forfeiture action.

As Bek's attorney, Jarrett moved in September 2002 to compel disclosure of the state's expert witnesses, who would be needed to establish that Bek's prescriptions actually caused the two patients' deaths. After some foot-dragging, the state admitted in March 2003 that it lacked conclusive toxicology evidence against Bek, and a month later it voluntarily dismissed the murder charges. This was an embarrassment for the Lake County prosecutors, given the public attention the Bek investigation had generated.

Four months later, federal prosecutors reindicted Bek for illegal drug distribution and other charges. Since Jarrett, who was still serving as Bek's attorney, was the target of a separate criminal investigation into the money-laundering scheme, the government urged the district judge in the Bek case to disqualify him, arguing that an attorney facing his own legal problems with federal prosecutors might have a conflict of interest that would keep him from rendering effective assistance to his client. The court determined that Bek understood the potential problem but still wanted to keep Jarrett as his attorney.[4]

In October 2003, IRS investigators recommended charges against Jarrett. In December 2003, 4 years after Jarrett first testified about his activities with Ripoll and Goode, a grand jury indicted him on six counts of money laundering and illegal structuring.

*Jarrett,* 447 F.3d 520, 522 -524 (C.A.7 (Ind.),2006).

On these facts, Jarrett filed his original motion to dismiss for vindictive prosecution asserting that the purpose of prosecuting him was to thwart his representation of Bek and to retaliate against him for succeeding in getting the state's felony-murder charges against Bek dismissed. Since the charges against Bek turned Federal, Jarrett asserted that the Government revived the case against

---

[4] Jarrett later withdrew from representing Bek for financial reasons. Bek was eventually convicted on all federal counts.

him to get him off the Bek case and avoid further embarrassment should the prosecution not result in a conviction. In his present motion, Jarrett perseveres in this argument but now, he asserts, there is additional evidence in the form of documents produced post-appeal to support his contentions.

## **DISCUSSION**

The Constitution prohibits the government from undertaking a prosecution based solely on a vindictive motive. *United States v. Jarrett*, 447 F.3d 520, 524 -525 (7th Cir. 2006). Indeed, "'for an agent of the [United States] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights'" is "'a due process violation of the most basic sort ....'" *Id. (quoting Bordenkircher v. Hayes,* 434 U.S. 357, 363 (1978)). Yet courts have acknowledged that the Constitutional protections which prohibit vindictive prosecution also permit the Government to utilize prosecutorial discretion in deciding which cases to bring, and when and how to bring them. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Thus, "in the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury rests entirely in his discretion.'" *Id. (quoting Bordenkircher*, 434 U.S. at 364).

In the Seventh Circuit's decision in *Jarrett*, the court reaffirmed that because of the presumption favoring proper prosecutorial decisionmaking, a demanding standard must be met to overcome the above presumption of regularity in that prosecutorial decisionmaking process:

> When a defendant is challenging his indictment, the presumption of regularity in favor of the government's conduct, combined with the requirement of clear evidence to the contrary and the 'rigorous standard' by which such evidence must be evaluated means that a claim of vindictive prosecution is extremely difficult to prove.

*Jarrett*, 447 F.3d at 526; see also *United States v. Johnson,* 221 F.3d 83, 94 (2nd Cir.2000) (A finding of "actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the

6

prosecutor ...."). Mindful of this rigorous standard, Jarrett's road to freedom runs uphill. And, as is noted below, given the absence of evidence in the record to support his contentions, the road is a dead end.

The relevant inquiry in a claim for vindictive prosecution is: (1) whether the prosecutors harbored genuine animus, and (2) whether, absent this animus, the defendant would not have been prosecuted. *United States v. Monsoor,* 77 F.3d 1031, 1034 (7th Cir. 1996). To prove vindictiveness in the government's decision to seek an indictment, Jarrett must present objective evidence that "the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *Jarrett,* 447 F.3d at 525. A defendant may do this by showing that the decision to pursue an indictment was not based on the "usual determinative factors" a responsible prosecutor would consider before bringing charges. *United States v. Spears,* 159 F.3d 1081, 1086 (7th Cir.1998). Only after a defendant comes forward with objective evidence of actual vindictiveness does the burden shift to the government to show that the motivation behind the charges was proper. *Bullis,* 77 F.3d at 1559. A court must be persuaded that the defendant would not have been prosecuted but for the government's animus or desire to penalize him. *United States v. Monsoor,* 77 F.3d 1031, 1034 (7th Cir.1996); *United States v. Goodwin,* 457 U.S. 368, 380 n. 12, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).

In his first go-round on the issue of prosecutorial vindictiveness, the undersigned concluded that the compelling circumstances surrounding Jarrett's indictment and subsequent prosecution created a circumstantial web of evidence sufficient to constitute a finding of vindictiveness. Under the theory that the whole picture painted by Jarrett created a mosaic of competent evidence, the undersigned concluded that the suspicious circumstances surrounding the rejuvenation of the

criminal case against Jarrett as well as the oddities in the prosecution could be utilized to fashion a merited claim of vindictive prosecution. Ultimately, however, the Seventh Circuit rejected Jarrett's evidence, writing:

> Based on our own examination of the record and the factors on which the district court relied, we conclude that the evidence is not legally sufficient to support a finding of vindictiveness.
>
> First, it should be noted that at no point has Jarrett produced any public or private statement by a prosecutor manifesting animus toward him; any document that might establish bad motives on the part of the government; or any similar "smoking gun." And so he builds his case on examples of suspicious timing, speculation about the government's motives, and allegations that the U.S. Attorney's office failed to follow its internal procedures in pursuing his indictment. Similarly, the district court based its finding on the "cumulative weight" of the facts it considered, acknowledging that "any one of these facts might appear suspicious but not indicative of vindictive prosecution." But that reasoning-the whole amounts to more than the sum of its parts-cannot take the place of clear and objective evidence, especially when the standard for vindictive prosecution is so rigorous.

*Id.* at 526-527. In line with the Seventh Circuit reasoning, the court must now examine the facts and evidence relied upon by Jarrett to determine whether the clear and objective evidence demanded by the Seventh Circuit so as to establish a bad motive for the Government's prosecution exist in the renewed motion Jarrett has filed.

Jarrett can present this clear and objective evidence by showing some evidence that conclusively establishes the Government's motive in prosecuting him was a laced with malice or other bad motive. The Seventh Circuit referred to such evidence above as a "smoking gun," i.e. some private or public statement by the Government that lends direct credibility to Jarrett's allegations. In his filings, Jarrett scours various email correspondence and letters from the Government in an attempt to find such evidence. At most, what Jarrett has uncovered could be deemed a "smoldering gun" with his main focus being on the vigor with which the Government

8

pursued his disqualification from the Bek case.

He notes, for instance, email correspondence in May, 2003 wherein the Assistant U.S. Attorneys in the district are informed that Jarrett had been formally identified as a target and were asked to identify whether he was counsel on any pending criminal cases. [Document 80]. There are also letters and correspondence wherein Government agents discuss that the Government should request hearings to notify Jarrett's clients of the potential conflict and secure a waiver before proceeding. [Documents 80, 328, 329]. Jarrett further points to an email from AUSA Randall Stewart,[5] wherein the Government wrote, "[I] would strongly recommend that we promptly charge ... or at least approach" Jarrett because it "would look extremely bad" to have moved for Jarrett's removal if he were not promptly charged. [Document 208]. In response, AUSA Sharon Johnson responded that the Jarrett case had been delayed because of IRS record delays and because Goode's cooperation was not secured until March, 2003 but that she hoped to indict by August, 2003. [Document 320]. However, Jarrett was not indicted until December, 2003.

With respect to the Bek case itself, after Bek's state charges were dismissed, and the federal prosecution of Bek was filed, Jarrett met with AUSA Diane Berkowitz, the prosecutor assigned to the Bek case. Jarrett points to Berkowitz's notes of May 22, 2003, wherein she notes that a decision must be made on whether Jarrett was an investigative target so that disclosure could be made to Bek and a waiver secured.[Document 348]. Apparently, Jarrett believes that the above emails demonstrate some sort of malicious intention by the Government to have him removed from cases which he, in turn, believes was spurred by the result of the State prosecution against Bek.

---

[5]AUSA Stewart was the prosecuting attorney in the death penalty case of Odell Corley. Jarrett represented Corley at the time he was notified that he was a target in a federal investigation.

Simply put, however, there is nothing in any of the above documents Jarrett discusses which could be deemed "clear and objective" evidence of vindictiveness. Certainly the above documents demonstrate a keen awareness by the Government that the fact that Jarrett was the subject of a criminal investigation created potential conflicts in his representation of other criminal defendants. But, what is absent from all of these documents is any inference of malice or bad motive by the Government in seeking his removal. Moreover, with respect to the Bek case, it is logical that the Government sought to protect Bek's right to counsel and avoid further embarrassment if he later asserted that his 6th Amendment right to counsel was violated due to Jarrett's own criminal investigation. Thus, Jarrett's evidence above has not uncovered any "smoking gun" evidence of vindictiveness in the actions of the Government.

The most damning piece of evidence which Jarrett can point to is one line of correspondence among AUSAs, but even this evidence requires one giant leap of faith to infer bad motive. In this line of email correspondence then- First Assistant U.S. Attorney David Capp inquired of other AUSAs in his office, "[State] Prosecutor's office called me again, any update? Did we get Jarrett out?" [Document 210]. In response, AUSA Berkowitz replied that Jarrett "intends to stay in as Bek is a paying client" and that the issue of Jarrett's continued representation of Bek could not be resolved until Bek was indicted. Bek was then indicted on August 22, 2003 and, at a hearing held before the Honorable Judge Rudy Lozano, Bek waived the conflict and Jarrett remained in the case until he voluntarily withdrew sometime later.

Certainly this evidence, creates some inference that the Government maintained a general attitude that Jarrett should be off the Bek case. What this evidence does not do is precisely what Jarrett needs to sustain his claim of vindictive prosecution, that is, point to any bad motive on the

part of the Government to indict Jarrett solely to remove him from that case. Nor does this evidence manifest any prosecutorial animus against Jarrett. Thus, this evidence, even if combined with all the other evidence in this case, does not bolster his contention.

Finally, Jarrett argues that the oddities of the investigation against him, the delay in receiving Goode's cooperation, and the fact that the investigation appeared dormant until he began representing Bek create an inference that the Government intended to utilize his prosecution to secure his removal from the Bek case. Jarrett has raised all of these issues in previous motions and the Seventh Circuit has rejected them as being insufficient to meet the standard for vindictive prosecution. None of the "new" evidence he submits alters that conclusion.

In sum, having reviewed all the evidence Jarrett presents in his Renewed Motion, he has presented little more than he did in his original motion which the Seventh Circuit concluded was insufficient to meet his rigorous burden. He has not presented any "clear and objective" evidence of vindictiveness and relies, as the Seventh Circuit concluded, on suspicion timing, innuendo, and procedural oddities alone. For this reason, his Renewed Motion must be DENIED.

## CONCLUSION

Based on the foregoing, Jarrett's "Renewed Motion to Dismiss Indictment or, in the Alternative for a New Trial Based Upon Prosecutorial Vindictiveness and Newly Discovered Evidence" [DE 182] is DENIED. Jarrett's "Request for a Revised Presentence Investigation Report." [DE 183] is GRANTED. The United States Probation and Pretrial Services Office shall provide a revised presentence investigation report (PSR) within sixty (60) days of this Order. Any objections to the revised PSR shall be filed with the court within 21 days after receipt of the revised document. The Government shall respond to any objections within 21 days thereafter. A

sentencing date shall be set by way of separate minute entry.


Entered: This 7th day of January, 2011

s/ William C. Lee<br>United States District Court