UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:03-CR-087 |
| | ) | |
| JERRY JARRETT | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court is the Government's "Motion for a Final Order of Forfeiture" [DE 190] filed on April 8, 2011. The Defendant Jerry Jarrett ("Jarrett") responded on May 10, 2011 to which the Government replied on June 8, 2011. For the following reasons, the Motion will be GRANTED.

## PROCEDURAL BACKGROUND

On December 14, 2004, a jury convicted Jarrett on three counts of money laundering, and particularly of knowingly laundering proceeds from drug transactions, in violation of 18 U.S.C. §1956(a)(1)(B)(i), one count of money laundering in violation of 18 U.S.C. §1957, and two counts of structuring in violation of 31 U.S.C. §5322(b). Thereafter, Jarrett filed a Renewed Motion for Judgment of Acquittal seeking to have his indictment dismissed based on a theory of vindictive prosecution.[1] The undersigned granted that motion (Docket #79, 5/23/2005), vacated the jury verdict, and the Government appealed. On appeal, the Seventh Circuit Court of Appeals reversed and remanded after concluding that Jarrett did not have "clear and objective" evidence of vindictive prosecution; rather, he presented only suspicious circumstances and inferences. The Seventh Circuit

---

[1] This was Jarrett's second motion to dismiss the indictment due to vindictive prosecution, the first having been made pre-trial and denied by the undersigned. See Docket #30 (11/02/04).

1

further ordered the jury verdict reinstated. *United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006).

This set in motion a flurry of legal motions on remand, all of which have now been resolved. *See* Docket entries 127, 128, 157, and 185. In anticipation of Jarrett's sentencing, the Government filed the present motion for a Final Order of Forfeiture [DE 190] wherein it seeks a personal money judgment totaling $92,000, an amount the Government asserts is supported by the evidence elicited at trial.

## FACTUAL BACKGROUND

The underlying facts of this case are well-established and have been fully articulated in the Seventh Circuit's opinion in *United States v. Jarrett*, 447 F.3d 522-524 (7th Cir. 2006). In summary fashion, they are recounted herein from the Seventh Circuit's Opinion:

> Jarrett, it is alleged, began cleaning up dirty money in April 1999, when a drug dealer named Carlos Ripoll brought him $67,000 in cash. Jarrett deposited the money in a series of small transactions (to evade currency transaction reports) into the bank account of a dormant small business he controlled.[2] Jarrett then prepared a backdated stock purchase agreement, representing that Ripoll had "invested" $15,000 in Jarrett's company, and issued a series of checks to Ripoll totaling $54,452 for "return on investment." As compensation for his services, Jarrett pocketed $12,000.
>
> Beginning in September 1999, Jarrett executed a similar series of sham transactions with a cocaine dealer named Gregory Goode, laundering $25,000 in drug money and keeping a $7,000 profit.
>
> Three months later, Ripoll was arrested and quickly began talking to the government. Among other things, he described his financial dealings with Jarrett, telling investigators that Jarrett was aware that he was handling drug money. Ripoll also described his drug dealings with Goode.

---

[2] Jarrett incorporated this business, "Left-Filled, Inc.," with his son in 1997, a time when Jarrett was disbarred for what the Indiana Supreme Court called "an alarming pattern of dereliction of duty, abandonment of clients' interests, often resulting in irreparable damage, and a blatant disregard of professional responsibilities." In *re Jarrett*, 657 N.E.2d 106, 109 (Ind. 1995). Left-Filled was supposed to market products for left-handed people. However, it apparently sold only a few items and never turned a profit. Jarrett regained his license to practice law in September of 1999.

> A federal grand jury subpoenaed Jarrett to testify in December 1999. Jarrett was designated as a fact witness, not a target, and fully cooperated. He produced records of his financial dealings with Ripoll and Goode but denied any knowledge that the money he received had come from drugs. (He said Ripoll and Goode told him that the money came from gambling winnings, selling cars, and rehabbing houses).
>
> In late 2000, after Goode was arrested, he gave a sworn proffer to the government in anticipation of plea negotiations. Goode...said Jarrett cleaned up a small amount of his money. However, he was equivocal about whether Jarrett knew the money came from drug dealing. In the proffer, Goode lied about his own drug-dealing activities and, according to a statement given a few years later, about the amount of money he gave Jarrett. The plea negotiations fell apart, and nothing came of the proffer.

*Jarrett*, 447 F.3d 520, 522-524 (7th Cir. 2006).

For reasons not relevant to the present motion, it took some time for the Government to have all its ducks in a row so as to indict Jarrett. In December 2003, 4 years after Jarrett first testified about his activities with Ripoll and Goode, a grand jury indicted him on six counts of money laundering and illegal structuring. As part of the Indictment, the Government included a forfeiture allegation indicating that if convictions resulted on any of Counts 1 through 4, the Government would seek forfeiture pursuant to Title 18 U.S.C. §982 of all property involved in or traceable to such offenses. It is from this portion of the Indictment that the Government's present motion was birthed.

## **DISCUSSION**

Title 18 U.S.C. §982 provides that the district court "shall order" forfeiture of "any property constituting, or derived from, proceeds the person obtained, directly or indirectly, as the result of [money laundering] violation[s]." In addition, Rule 32.2(b)(1) and (c)(1) of the Federal Rules of Criminal Procedure authorizes the entry of a Final Order of Forfeiture in the form of a personal

3

money judgment, such as the Government seeks here. *See United States v. Baker*, 227 F.3d 995, 967 (7th Cir. 2000) (holding that money judgments for the amount involved in the money laundering offense are permissible and commonplace); *United States v. McGinty,* 10 F.3d 1242, 1246 (10th Cir.2010) ("We ... conclude that ... money judgments are appropriate under criminal forfeiture."); *United States v. Awad,* 598 F.3d 76 (2d Cir.2009) ("[C]riminal forfeiture need not be traced to identifiable assets in a defendant's possession."); *United States v. Day,* 524 F.3d 1361, 1377–78 (D.C.Cir.2008) ("Nothing in the relevant statutes suggests that money judgments are *forbidden.*" (emphasis in original)); *United States v. Padron,* 527 F.3d 1156, 1162 (11th Cir.2008) ("[T]he federal rules explicitly contemplate the entry of money judgments."); *United States v. Misla–Aldarondo,* 478 F.3d 52, 72–75 (1st Cir.2007) ("If the [G]overnment seeks, and the court grants, a money judgment as part of the forfeiture order, then 'the [G]overnment need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction ... [A] court may properly issue a money judgment as part of a forfeiture order, whether or not the defendant still retains the actual property involved in the offense, or any property at all.' ").

Furthermore, 28 U.S.C. §2461(c) clearly permits the government to seek forfeiture in the form of money judgments for criminal forfeiture cases, in accordance with the Federal Rules of Criminal Procedure. *United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008). It follows then that the Government's request to obtain a money judgment is permissible, and it only remains to be determined whether the amount it requested is supported by a preponderance of the evidence. *See United States v. Ali*, 619 F.3d 713, 720 (government required to prove loss amount for forfeiture by preponderance of the evidence); *United States v. Melendez*, 401 F.3d 851, 856 (7th Cir. 2005)

4

(holding that because forfeiture has long been a civil remedy as well as a criminal sanction the facts as to forfeiture need only be proved by a preponderance of the evidence).

On this point, the Government asserts that the evidence presented at trial is sufficient to support its evidentiary burden of a "preponderance of the evidence." This evidence, the Government argues, demonstrates that Jarrett laundered approximately $72,000 on behalf of Ripoll and Goode and retained an additional $20,000 as a fee for his services. Therefore, the Government requests a judgment in the amount of $92,000.

In his response to the motion, Jarrett's objections are three-fold: first, he argues that the Government has not established that the amount sought in the forfeiture order came from drug proceeds or that Jarrett knew of the money's illegal source; second, he asserts that the evidence at trial does not support the $92,000 amount sought by the Government; and finally, he contends that the Government is required to prove the $92,000 amount totaled the "net proceeds" from drug activities and it has not done so. Each of these arguments will be addressed in turn.

**I. Jarrett's Knowledge of the Money's Illegal Source**

Jarrett's first contention challenges the sufficiency of the Government's evidence that the money laundered was drug money or that Jarrett knew the illegal source of such money. A conviction for money laundering under 18 U.S.C. §1956 requires not only that the defendant participate in the actual conduct of a financial transaction, but also that he possess the knowledge that the property involved in said transaction results from some unlawful activity. Therefore, to be convicted of money laundering, Jarrett necessarily had to know that the money he deposited into the Left-Filled account came from unlawful activity, namely drug proceeds. Since Jarrett's conviction on counts 1 through 4 required the jury to find beyond a reasonable doubt that the money laundered

constituted drug money, and more importantly, that Jarrett **knew** of the money's illegal nature, Jarrett's sufficiency of the evidence claim is unfounded. Indeed, his challenge regarding whether he was aware of the illegal nature of the money he laundered goes to the merits of his conviction and seeks, in essence, to overturn the jury's conviction. To the extent Jarrett seeks to overturn the jury's finding, this is a matter for appeal on the merits of his conviction. *See United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006) (holding that Jarrett will have a full opportunity to challenge any aspect of his trial, or proceedings after remand).

More importantly, however, even if the Court did address the merits of Jarrett's argument, the evidence at trial clearly supports the Government's position that Jarrett knew the money he received from Goode and Ripoll constituted drug proceeds. Goode testified at trial that Jarrett "explained to me that he could help me clean up my drug money." (Trial Trans. Vol. 2, p. 200). Goode also testified that he delivered money to Jarrett and Jarrett provided him checks to "legitimize the money I got from selling drugs." (*Id.* at p. 201). Ripoll further testified that the only money he had was drug money and that Jarrett told him that he would "clean up" his money by depositing the money into the Left-Filled, Inc. account. (Trial Trans. Vol. 3, pp. 263-265). Both Ripoll and Goode testified that Jarrett created false purchase agreements and stock certificates for Left-Filled, Inc. to make it appear that the money was for a legitimate corporate investment. (Trial Trans. Vol. 2 pp. 202-205; Vol. 3 pp. 193-195). Thus, it is clear from the record that there is sufficient evidence for the Government's contention that Jarrett had knowledge that the money he was given was from illegal drug activity.

## II. Calculating the Amount

Jarrett's second contention questions the amount of money the Government seeks in the order for forfeiture. Jarrett claims the $92,000 requested by the Government is not sufficiently supported by the Government's evidence, as it does not pass the required threshold of a preponderance of the evidence.

To support its position, the Government relies on the evidence presented at trial that Jarrett deposited $72,000 for Ripoll and Goode, and pocketed $20,000 for himself. More specifically, the Government states that Jarrett deposited $18,000 for Goode and the remaining $54,000 for Ripoll into the Left-Filled Account. He kept cash totaling $20,000 which constituted his "fees" for laundering their money.

To get to these figures, the Government notes that the trial testimony established that Ripoll gave Jarrett $67,000 (Trial Trans. Vol. 3, p. 186) and Goode gave Jarrett $25,000 in cash (Trial Tran. Vol. 2. p. 201-202). From the money he received from Ripoll, Jarrett then made small cash deposits (and one large deposit) totaling $50,400 between April 6 and April 30, 1999 into the Left-Filled Account. (See Government's Trial Exh. 21 attached to Government's Reply to Motion for Order of Forfeiture). In addition, Jarrett deposited checks/money orders from Ripoll totaling $4,695. (Trial Trans. Vol. 2, p. 94: two check deposits). Jarrett, in turn, wrote Ripoll checks from the Left-Filled account totaling $54,552.00. (See Gov't Trial Exh. 22 attached to Government Reply). Jarrett then kept $12,000 of the money he received from Ripoll as his "fee." (Trial Trans. Vol. 3, p. 193). From the money he received from Goode, Jarrett structured small deposits to the Left-Filled account totaling $18,000. (Trial Trans. Vol. 4. pp/. 46-47; Gov't Trial Exh. 23). Goode then received back from Jarrett, 4 checks totaling $18,000 drawn on Jarrett's Left-Filled corporate account. (Trial

Trans. Vol. 4, p. 48; Gov't Trial Exh 24). Jarrett retained $7,000 of the $25,000 he received from Goode. (Trial Trans. Vol. 2, p. 209).

Jarrett challenges these numbers, however, claiming that the Government is "off" on its amounts by approximately $4,600 because Government's Trial Exhibit 21, attached to its Motion for Forfeiture, shows deposits made by Jarrett on behalf of Ripoll that total $50,400, with the remaining $12,000 given to Jarrett pocketed as a service fee. Jarrett does not dispute the $25,000 amount relating to Goode. Thus, using his calculations, Jarrett asserts that the total amount deposited should only be $68,400 and not $72,000. When the "service fee" is added back in, Jarrett believes the total amount should be $87,400 not $92,000.

Unfortunately for Jarrett, this is much ado about nothing. Jarrett's calculations fail to account for the $4,600 checks/money orders written from Ripoll to Jarrett on top of the cash deposits set out in Trial Exhibit 21. (See Trial Trans. Vol 2, p. 94; Vol. 4, pp. 51-52). Jarrett fusses about what he sees as an addition $4,600 tacked on to the amounts but he has not provided any proof that these checks/money orders written from Ripoll to Jarrett were not properly in the Government's calculations. In contrast, the Government has provided trial testimony which supports its calculations. Thus, adding up the cash and check deposits, the Government reaches its rounded amount of $55,000 as the total amount <u>deposited</u> by Jarrett to the Left-Filled account from Ripoll. Moreover, the remaining evidence from the Government certainly establishes by a preponderance of the evidence that Jarrett received and deposited $18,000 from Goode and retained $20,000 total in fees from Ripoll and Goode. Thus, Jarrett's contention that the Government has not proven the amounts by a preponderance of the evidence is misplaced.

**III.     Net proceeds**

Jarrett's third and final contention is that the Government did not prove the deposits made by Jarrett were "net proceeds" of drug activities, as opposed to "gross proceeds." He claims only the former proceeds can be used to establish the amount that informs the forfeiture request under the authority of *United States v. Santos*, 553 U.S. 507 (2008); *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002); *United States v. Lee*, 558 F.3d 638 (7th Cir. 2009).

Of the cases cited by Jarrett, the most significant is the Supreme Court's decision in *Santos,* where a plurality of the Court held the term "proceeds" to mean "profits" for purposes of a conviction under the money laundering statute, 18 U.S.C. §1956. According to the plurality, "a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid." *Santos, 553 U.S.* at 517. Applying this determination, then, Jarrett claims that checks written to the IRS for payment of income taxes, identified in Government's trial exhibit 22 as an amount totaling $30,052, should be properly deducted from gross receipts of the drug activity as a necessary business transaction. The amount left after paying taxes would be the net amount of the laundering activity and thus, the amount relevant to the forfeiture allegation.

The *Santos* decision warrants additional discussion particularly given the limited interpretation it has received in the lower courts. First, as the Government points out, *Santos* defined "proceeds" in the context of the substantive money laundering statute for which Jarrett has already been convicted and thus, has no bearing in a forfeiture proceeding which is a part of the sentencing not the substantive offense. *Libretti v. United States*, 516 U.S. 29, 38-39 (1995).

Second, even if the undersigned applied *Santos* to the forfeiture issues here, Justice Stevens, in his concurring opinion, limited the holding of the Court to the illegal gambling involved in the

9

case: "In other applications of the statute not involving such a perverse result [as in this case], I would presume that the legislative history summarized by Justice Alito [that "proceeds" means "receipts"] reflects the intent of the enacting Congress." *Id.* at 528 n. 7. Justice Stevens thus carved out an exception for gambling operations in which "proceeds" means "profits," although the general rule is that "proceeds" means "receipts." *Id.*

Because the Supreme Court did not issue a majority opinion, all lower courts to have considered the issue presently raised by Jarrett have determined that the decision is limited to the "position taken by [the concurring member] in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188,193 (1977). Thus, in line with *Marks,* these courts have concluded that Justice Stevens' concurrence limits the "profits" definition of "proceeds" to money laundering cases involving a gambling operation like the one in the *Santos* case. *United States v. Howard,* 309 Fed.Appx. 760, 771 (4th Cir.2009) ("Because *Santos* does not establish a binding precedent that the term 'proceeds' means 'profits,' except regarding an illegal gambling charge, we are bound by this Court's precedent establishing that 'proceeds' means 'receipts.' ") (unpublished); *See also United States v. Fernandez,* 559 F.3d 303 (5th Cir.2009); *United States v. Schlesinger*, 261 Fed.Appx. 355 (2nd Cir. 2008) (limiting interpretation of *Santos* and concluding that the forfeiture provision calls for the forfeiture of all "proceeds" of unlawful activities; "proceeds" are not limited to the net gain or profit realized from the offense."); *United States v. Casey,* 444 F.3d 1071 (9th Cir. 2006); *United States v. Miller*, 2009 WL 2949784 (D. Kan. 2009) ("Given the nature of the *Santos* opinion, the Court disagrees with the defendant that it should be extended to the definition of proceeds in the context of forfeiture...").

Just last month, in *United States v. Olguin*, ___ F.3d ___, 2011 WL 2186441, the Fifth Circuit reaffirmed its position that gross proceeds is the appropriate calculation in a forfeiture order:

> ...[T]here is a logical inconsistency in holding that a forfeiture order reaches only profits and not receipts in a context where narcotics are illicitly trafficked for profit. Such a holding would excuse monies spent on the cost of running the conspiracy and the enterprise. In this case, that would mean that the law turns a blind eye to the cost of renting a U–Haul, the monies spent on the communications apparatus erected to further the enterprise, and any other monies expended to fuel the conspiracy.

*Olguin,* 2011 WL 2186441, 15 (5th Cir. June 7, 2011). The Fifth Circuit, in reaching its conclusion quoted from the Seventh Circuit's opinion in *United States v. Ginsburg*, 773 F.2d 798, 803 (7th Cir.1985) (rejecting argument that certain portions of a defendant's money remains beyond the reach of a forfeiture order):

> a [defendant] who dissipates the profits or proceeds of his [illegal] activity on wine, women and song has profited from .... crime to the same extent as if he had put the money in his bank account. Every dollar that the [criminal] derives from illicit activities and then spends on such items as food, entertainment, college tuition and charity is a dollar that should not have been available for him to spend for these purposes.

*Olguin,* 2011 WL 2186441, 15.

Given the above cases, this court cannot conclude, as Jarrett argues, that the Government is required to prove "net proceeds" in its forfeiture request. The amount of income taxes paid do not reduce the forfeiture amount and thus, the Government, as previously noted, has sustained its burden of demonstrating that the amount of its forfeiture request, $92,000, is the appropriate amount.

## **CONCLUSION**

Based on the forgoing, the Government's "Motion for a Final Order of Forfeiture" [DE 190] is GRANTED in the amount of $92,000.

Entered: This 20th day of July, 2011

s/ William C. Lee<br>United States District Court